## Local 530, AFSCME, Council 15 *v.* City of New Haven
(4432)

Dupont, C. J., Hull and Spallone, Js.

Argued October 8—decision released December 9, 1986

*Frank J. Raccio,* for the appellant (plaintiff).

*H. Gordon Hall,* assistant corporation counsel, for the appellee (defendant).

Hull, J. This case involves the narrow issue of whether an arbitration award by the Connecticut board of mediation and arbitration should be vacated on the ground of "evident partiality" of an arbitrator who had been appointed by the mayor of the city of New Haven to the representative policy board of the south central regional water authority. We conclude that the trial court was correct in refusing to vacate the award.

For disciplinary reasons, the New Haven police chief suspended Officer Thomas Morrissey for five days without pay. In accordance with the collective bargaining agreement, he submitted a grievance through the plaintiff Council 15 (hereinafter "the union") to the board of mediation and arbitration. The board designated a tripartite panel to arbitrate the dispute. This panel consisted of Thomas J. Staley, panel chairman and public member, Angelo Monitto, management member, and Frank J. Avallone, labor member. At the start of the hearing, the union moved that Avallone be disqualified. The basis for the motion was that Avallone was a "mayoral appointee." No further representations concerning his appointed capacity were made in support of the motion. The arbitration panel denied the motion and proceeded with the hearing. The board ruled that the five day suspension was not for just cause and ordered it modified to a one day suspension without pay. The plaintiff then filed suit in Superior Court seeking an order vacating the board's award. It claimed that the rendition of the award by a panel of arbitrators that included a city appointee represented evident partiality on the part of that arbitrator in violation of General Statutes § 52-418 (a) (2).[1] The defendant filed a cross application to confirm the award. The court denied the application to vacate and granted the cross application. This appeal followed. The parties stipulated to the court that Avallone had been appointed to the south central regional water authority by the mayor of New Haven before the commencement of the arbitration proceedings. The plaintiff conceded at trial and

[1] General Statutes § 52-418 (a) provides in pertinent part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: . . . (2) if there has been evident partiality or corruption on the part of any arbitrator . . . . "

in this court that there was no evidence of impropriety or misconduct on the part of the arbitrators. The court's memorandum of decision stated simply that: "The plaintiff's sole claim is that the panel member created an appearance of bias. It is the finding of the court that there is no evidence to support the alleged appearance of bias."

The south central regional water authority, the south central regional water district and the representative policy board were created by Connecticut Special Act No. 77-98, as amended by Connecticut Special Act No. 78-24, §§ 3, 4 and 5. The authority was created to provide and assure the provision of an adequate supply of pure water at a reasonable cost within the regional water district. The authority is described in the special act creating it as a public corporation, a public instrumentality and a political subdivision. The functions of the representative policy board include the power to approve (1) water rates established by the authority, (2) the disposition of land and establishment of land use standards, (3) the initiation of large-scale construction projects, (4) the acquisition of any other water system, (5) the location of a new filter plant, if necessary, and certain other items. The voting power of each member of the board is a weighted vote based upon the number of customers and the number of acres owned by the authority in the municipality from which the member has been appointed. Avallone, the board member named by the city of New Haven, had the largest weighted vote.

The plaintiff claims that close judicial scrutiny should be paid to the question of "evident partiality" because Avallone was the "labor member" of the tripartite arbitration panel. When an employer and employee organization submits a grievance to the Connecticut board of mediation and arbitration for arbitration, a tripartite panel of board members is assigned to the case

unless the parties agree to a single member. See General Statutes §§ 31-93 and 31-97.[2] Such a panel was set up in this case. The members of the tripartite panel are empowered by statute to represent the interests of employers, employees, and the public. See General Statutes §§ 31-91 and 31-92.[3] When an alternate mem-

[2] General Statutes § 31-93 provides: "In the performance of the duties of conciliation, mediation or arbitration, the board shall be represented by a panel of three of its members, except that, in arbitration, a single public member of the board may arbitrate instead of a panel by joint agreement of the parties involved, and in such event such member shall have all the powers of a panel. In each case, the employee or his representative appearing before said board shall be permitted to designate the labor member of the board of mediation and arbitration who shall serve and the employer or his representative appearing before said board may designate the employer member of the board of mediation and arbitration who shall serve. The chairman of the board of mediation and arbitration shall serve as the member representing the public; if he is unable to serve, the deputy chairman shall serve in his stead. Whenever members are unable to serve, alternate members may be delegated to serve in accordance with the provisions of this chapter."

General Statutes § 31-97 (a) provides: "Whenever a grievance or dispute arises between an employer and his employees, the parties may submit the same directly to said board and notify said board or its clerk in writing and upon payment by each party of a filing fee of twenty-five dollars. Whenever a single public member of the board is chosen to arbitrate a grievance or dispute, as provided in section 31-93, the parties shall each be refunded the filing fee. Whenever such notification is given, a panel of said board, as directed by its chairman, shall proceed with as little delay as possible to the locality of such grievance or dispute and inquire into the causes thereof. The parties shall thereupon submit to said panel in writing, succinctly, clearly and in detail, their grievances and complaints and the causes thereof, and severally promise and agree to continue in business or at work without a strike or lockout until the decision of the panel is rendered; but such agreement shall not be binding unless such decision is rendered within ten days after the completion of the investigation. The panel shall fully investigate and inquire into the matters in controversy, take testimony under oath in relation thereto and may administer oaths and issue subpoenas for the attendance of witnesses and for the production of books and papers."

[3] General Statutes § 31-91 provides: "There shall be, in the labor department, a board of mediation and arbitration, consisting of two panels of three members each. One member of each panel of said board shall represent employers of labor, one shall represent employees and one shall represent the public in general. No such public member shall have been the representative of any employer or employee in a labor dispute during the five years immediately preceding the year of his appointment. One of the pub-

ber serves on a panel in place of a member, he is required to represent the same interest as the member in whose place he serves. General Statutes § 31-92. The plaintiff points out that Avallone was an alternate labor member of the board. He was not designated by the plaintiff to serve in the arbitration proceeding in question. Thus, the plaintiff argues that it was the labor member, the plaintiff's representative on the arbitration panel, who gave "the appearance of bias" in favor of the employer who appointed him. The plaintiff

lic members of said board shall be the chairman. Each member representing employees shall be a member of a bona fide labor organization, which may be either a national or an independent organization, but said two board members shall not be members of the same labor organization. On or before July fifteenth in the odd-numbered years, the governor shall appoint two members of said board to succeed the members whose terms expire. The term of office for the members of said board shall be six years. The board shall choose a public member as deputy chairman to serve in case of the death, removal, incapacity or absence of the chairman. Any vacancy in the membership of said board shall be filled by the governor for the unexpired portion of the term. Any member of the board may be removed by the governor for cause or for the good of the service, but only after notice and public hearing upon charges preferred and subject to the right of appeal to the superior court. A vacancy in the membership for any cause shall be filled by the governor within thirty days of the date of its occurrence."

General Statutes § 31-92 provides: "Whenever conditions warrant, the labor commissioner or the chairman of the board shall request the governor to appoint, and the governor shall have authority to appoint, one or more alternate members to the board of mediation and arbitration in such numbers and for such periods of time as may be necessary but not longer than one year, in order that said board may render efficient service to employers and their employees whenever grievances or disputes arise. Alternate members so appointed shall have power to complete any matter pending at the expiration of the terms for which they were appointed. Alternate labor members shall be members of a bona fide national or independent labor organization. Alternate members of the board of mediation and arbitration shall serve at any time when so delegated by the board and while so serving shall have all the powers of members of the board. Whenever an alternate member serves in place of a member of the board, he shall have all the powers of members of the board. Whenever an alternate member serves in place of a member of the board, he shall represent the same interest as the member in whose place he serves. Said board may, at its option, require alternate members to sit with it in the fulfillment of any function of the board."

asserts that since the claim of an "appearance of bias" relates to an arbitrator who is charged by statute with representing the interest of the party asserting the claim, a conflict of interest can be inferred which amounts to "evident partiality." We conclude that no special close judicial scrutiny is required other than that which we are sworn to give in every case.

The defendant also claims that the limited judicial scrutiny of arbitration awards requires a strict rule concerning the appearance of bias of arbitrators. The limited scope of judicial review of awards is clearly the law in Connecticut. *Middletown* v. *Police Local, No. 1361,* 187 Conn. 228, 231, 445 A.2d 322 (1982). *American Motorists Ins. Co.* v. *Brookman,* 1 Conn. App. 219, 221–22, 470 A.2d 253 (1983), cert. denied, 193 Conn. 801, 473 A.2d 1226 (1984); *State* v. *Connecticut Council 4, CEU, AFSCME,* 7 Conn. App. 286, 289, 508 A.2d 806 (1986); *Hartford* v. *Local 760,* 6 Conn. App. 11, 13–14, 502 A.2d 429 (1986). The burden of proof is on the movant. *Milford Employee Association* v. *Milford,* 179 Conn. 678, 682–83, 427 A.2d 859 (1980).

The defendant argues that the relationship of Avallone with the city is free from factors allowing the city to pressure him or cause him to identify his interests with those of the city. This argument, however, does not meet head on the plaintiff's argument. The plaintiff presents the very narrow issue that it doesn't "look right" if the labor member of the arbitration panel has earlier been appointed by the employer to an important position affecting the employer's interests.

The plaintiff particularly relies on *Commonwealth Coatings Corporation* v. *Continental Casualty Co.,* 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968). In *Commonwealth Coatings,* the petitioner, a subcontractor, had sued the sureties on the prime contractor's

bond to recover money allegedly due on a painting job. Under the arbitration clause in the contract, the petitioner appointed one arbitrator, the prime contractor appointed another, and the two appointed a third. The third arbitrator was an engineering consultant whose services were used sporadically by the prime contractor. He was paid about $12,000 over four or five years for his services. The relationship "went so far as to include the rendering of services on the very projects involved in [the arbitration]." Id., 146. The petitioner challenged the arbitration award on the ground that this close business connection was not disclosed until after the award was made. The Court of Appeals affirmed the District Court's refusal to set aside the award. The Supreme Court reversed, holding that even in the absence of actual fraud or bias on the part of an arbitrator, an arbitration award should be vacated where the arbitrator failed to disclose a prior business connection with one of the parties.

The applicable federal legislation authorized vacation of an award which was " 'procured by . . . undue means' or '[w]here there was evident partiality . . . in the arbitrators.' " Id., 147. The majority analogized the appropriate test to that required of the judiciary stating that "this canon of judicial ethics rests on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." Id., 150. The court also stated a stricter rule for arbitrators than judges, holding that "[i]t is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." Id., 148–49.

There is a paucity of Connecticut authority on the exact point in issue. In *Schwarzschild* v. *Martin,* 191 Conn. 316, 464 A.2d 774 (1983), the issue of disqualification of an arbitrator for evident partiality was not involved. The court stated in not upholding a party's claim of unlawful bias that "[t]his court has summarily rejected attempts to overturn arbitration awards on grounds of partiality in cases, like the present one, which lacked sufficient evidentiary support. *Von Langendorff* v. *Riordan,* 147 Conn. 524, 163 A.2d 100 (1960)." *Schwarzschild* v. *Martin,* supra, 327. *Von Langendorff* likewise did not involve the issue in this case.

Although it did not face the exact situation with which we are faced, *Petrowski* v. *Norwich Free Academy,* 199 Conn. 231, 506 A.2d 139 (1986), is dispositive. The Supreme Court, after certification, heard an appeal from a judgment of this court reversing a decision of the Superior Court. That court had dismissed the plaintiff's appeal from the termination of her employment by the board of trustees of the Norwich Free Academy. Certification was granted to review the judgment of this court that the failure of two members of the board to disqualify themselves from the plaintiff's case, because of their inherent conflicts of interest, violated state and federal constitutional due process principles. The Supreme Court reversed the judgment of this court in *Petrowski* v. *Norwich Free Academy,* 2 Conn. App. 551, 481 A.2d 1096 (1984). The Supreme Court summarized the setting of the issue before it as follows: "The Appellate Court reversed the Superior Court's decision, concluding that the presence of Tillinghast and Dutton on the board of trustees per se violated the plaintiff's federal due process rights because it created an appearance of impropriety. The court reached its decision by equating the due process test for disqualification of an admin-

istrative adjudicator with the standard for judicial disqualification. 'When administrators act in a quasi-judicial capacity, as the board in this case did, their functions and that of judges most closely merge and the judicial model to test impropriety becomes an acceptable one.' *Petrowski* v. *Norwich Free Academy,* supra, 560.

"The defendants' request to this court for certification raised a single question: Is the federal due process test for disqualification of an administrative official acting in a quasi-judicial capacity the same as the test for the disqualification of a judge? The plaintiff filed a preliminary statement of issues under Practice Book § 3012 (a) [now § 4013], in order to provide an alternative basis for affirming the Appellate Court's decision. The relevant issue, broader in scope than that before us on certification, is: 'Did the defendants violate the plaintiff's right to due process under Connecticut General Statutes [Rev. to 1983] § 10-151 and the Fourteenth Amendment to the United States Constitution when trustees Dutton and Tillinghast participated in the hearing and decision, although they were disqualified?'

"The defendants [in *Petrowski* did] not dispute the proposition, as stated in the dissenting opinion of the Appellate Court, that 'had Tillinghast and Dutton been judges participating in a judicial proceeding they would have been disqualified, because the relationship between their law firm and the academy would have violated the governing standard for judicial disqualification, which is the reasonable appearance of impropriety.' *Petrowski* v. *Norwich Free Academy,* supra, 566 (*Borden, J.,* dissenting) . . . . *Petrowski* v. *Norwich Free Academy,* 199 Conn. 231, 233–35, 506 A.2d 139 (1986)." They claimed only that administrative adjudications are not governed by the principles governing judicial disqualification.

The Supreme Court stated further: "The courts recognize the presumption that administrators serving as adjudicators are unbiased. See *Withrow* v. *Larkin,* 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975); *United States* v. *Morgan,* 313 U.S. 409, 421, 61 S. Ct. 999, 85 L. Ed. 1429 (1940). This presumption can be rebutted by a showing of a conflict of interests; see *Gibson* v. *Berryhill,* 411 U.S. 564, 578–79, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973); *Ward* v. *Monroeville,* 409 U.S. 57, 60, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972); but the burden of establishing a disqualifying interest rests on the party making the contention. *Schweiker* v. *McClure,* 456 U.S. 188, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982). The impermissible interest asserted must be realistic and more than 'remote.' *Marshall* v. *Jerrico, Inc.,* [446 U.S. 238, 242, 250, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980)].

" ' "The fact that [an administrative hearing officer] might have been disqualified as a judge . . . does not, either in principle or under the authorities, infect the hearing with a lack of due process." *Lopez* v. *Henry Phipps Plaza South, Inc.,* 498 F.2d 937, 944 (2d Cir. 1974).' *Petrowski* v. *Norwich Free Academy,* supra, 567 (*Borden, J.,* dissenting); see *Goldberg* v. *Kelly,* 397 U.S. 254, 271, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). . . . In *Florasynth, Inc.* v. *Pickholz,* 750 F.2d 171, 173–74 (2d Cir. 1984), the Second Circuit Court of Appeals noted that although arbitrators do act in a quasi-judicial capacity, the disqualification standard for judges need not be applied. 'The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator.' Id.; see *Morelite Construction Corporation* v. *New York City District Council Carpenters Benefit Funds,* 748 F.2d 79, 85 (2d Cir. 1984); *International Produce, Inc.* v. *A/S Rosshavet,* 638 F.2d 548, 552 (2d Cir.), cert. denied, 451 U.S. 1017, 101 S. Ct. 3006, 69 L. Ed. 2d 389 (1981)." *Petrowski* v. *Norwich Free Academy,* 199 Conn. 231, 236–37, 506 A. 2d 125 (1986).

The Supreme Court then stated: "The canons of judicial ethics go far toward cloistering those who become judges, the ultimate arbiters of constitutional and statutory rights, from all extraneous influences that could even remotely be deemed to affect their decisions. Such a rarefied atmosphere of impartiality cannot practically be achieved where the persons acting as administrative adjudicators, whose decisions are normally subject to judicial review, often have other employment or associations in the community they serve. It would be difficult to find competent people willing to serve, commonly without recompense, upon the numerous boards and commissions in this state if any connection with such agencies, however remotely related to the matters they are called upon to decide, were deemed to disqualify them. Neither the federal courts nor this court require a standard so difficult to implement as a prerequisite of due process of law for administrative adjudication." *Petrowski* v. *Norwich Free Academy,* supra, 238.

The Supreme Court concluded that "Tillinghast and Dutton's membership in the law firm that represents Norwich Free Academy on unrelated matters is too remote and tenuous a connection to have required under due process principles their disqualification from the board." *Petrowski* v. *Norwich Free Academy,* supra, 240. It also agreed with the trial court's factual conclusion that their interests were too remote and nebulous to require such disqualification under state law. Id., 242.

We consider first the impact of *Petrowski* on this case. *Petrowski* involved administrative adjudicators in Connecticut while this case involves arbitrators. Thus, although the language quoted from *Petrowski* concerning disqualification of arbitrators is not directly involved in the decision, the fact that the three Second Circuit Court of Appeals cases holding that the judi-

cial standard did not apply to arbitrators was cited favorably, is strongly persuasive.

We next note the nature of the claimed disqualification here. There was no substantial claim before the arbitrators or the Superior Court to justify even the appearance of bias. The mere speculative statement of bias by a participant in the arbitration proceeding does not in and of itself justify a claim of disqualification. Otherwise a mere claim would automatically require disqualification. The record is totally devoid of any evidence that Avallone was "under the thumb" of the mayor of New Haven or felt indebted to him because of his appointment to this $50 a day plum. We conclude that even under the "appearance of bias" standard the claimed reasons for disqualification were too remote and nebulous to have required disqualification. The appearance of bias must be reasonable.

We move to the question of whether *Commonwealth Coatings* required disqualification as a matter of federal due process. Three Second Circuit cases, cited by the Supreme Court in *Petrowski,* considered this question. We agree with the rationale of the Second Circuit in *International Produce, Inc.* v. *A/S Rosshavet,* supra. In that case, the neutral arbitrator disclosed that he was also a nonparty witness in another arbitration dispute involving the same law firms as were involved in the instant dispute. After adequate notice before the arbitration proceeding began, he declined to disqualify himself. The party ordered by the arbitration panel to pay damages petitioned the district court for an order vacating that award because one of the arbitrators should have recused himself. The district court granted International's petition to vacate the award finding that the arbitrator's appearance of bias toward one of the law firms in the arbitration violates 9 U.S.C. § 10 (b).[4]

---

[4] 9 U.S.C. § 10 provides: "In either of the following cases the United States court in and for the district wherein the award was made may make an

The Second Circuit reversed. It found that in holding that the standard for reviewing the award was whether there was "an appearance of bias" the district court was equating that standard with "evident partiality." The Second Circuit did not find support in *Commonwealth Coatings* for such a proposition in view of the facts of that case. The court stated: "Mr. Justice Black's plurality opinion found that the arbitrator's failure to disclose required setting aside the award for 'evident partiality.' He wrote that an arbitration panel 'not only must be unbiased but also must avoid even the appearance of bias.' [*Commonwealth Coatings Corporation* v. *Continental Casualty Co.,* supra, 150].

"However, Mr. Justice White, writing for himself and Mr. Justice Marshall, concurred for somewhat different reasons:

" 'The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. . . . [I]t is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party [to the arbitration], that fact must be disclosed. [Id., 151–152]. . . . Thus, two of the justices restricted the scope of the Court's ruling to situations where business and financial dealings with a party are not disclosed by the arbitrator and disassociated themselves from Justice Black's dictum about 'appearance of bias.' Three justices dissented.

"We agree, therefore, with the appellant, that the Supreme Court in *Commonwealth Coatings* did not expand the § 10 standard of 'evident partiality' to

order vacating the award upon the application of any party to the arbitration—(a) Where the award was procured by corruption, fraud, or undue means. (b) Where there was evident partiality or corruption in the arbitrators, or either of them."

include 'appearance of bias.' In *Commonwealth Coatings* there was clear, unexplained evidence of 'evident partiality.' Here we have an assertion of 'appearance of bias' which seems to us, at best, to be speculation without substance. . . . There was no claim of bias on the part of [the arbitrator], or even of any animosity toward any counsel. Thus, the record is completely bare of anything remotely resembling 'evident partiality.' See *Ilios Shipping and Trading Corp.* v. *American Anthracite and Bituminous Coal Corp.*, 148 F. Supp. 698 (S.D.N.Y.), aff'd, 245 F.2d 873 (2d Cir. 1957) (per curiam). We doubt that there is any substantial basis for finding even an 'appearance of bias' in [the arbitrator's] position or anything he did. Be that as it may, we are convinced that there is no evidence of 'evident partiality.' " *International Produce, Inc.* v. *A/S Rosshavet,* supra, 551.

In *Morelite Construction Corporation* v. *New York City District Council Carpenters Benefit Funds,* 748 F.2d 79 (2d Cir. 1984), the Second Circuit Court of Appeals again faced the issue of disqualification for "evident partiality" in a case involving a father-son relationship between an arbitrator and an officer of one party to the arbitration. In reversing the District Court and vacating the award, the Court of Appeals emphasized that "[a]n inquiry into issues of fairness, bias, partiality and the like overflows with factual questions." Id., 81. Chief Judge Kaufman of the Court of Appeals noted that in this area of the law the result of *Commonwealth Coatings* appears to be "ongoing uncertainty." Id., 82. The court stated, "Justice Black, writing for a plurality of four justices, appeared to impose upon arbitrators the same lofty ethical standards required of Article III judges. . . . Four justices, however, do not constitute a majority of the Supreme Court. Justice White, writing for himself and Justice Marshall, concurred in the result, but made clear the Court was not holding that arbitrators' and judges' ethi-

cal standards are coextensive." Id., 82. The court found much of Justice Black's opinion to be dicta. The court wrestled with this question stating: "It might be thought that Justice Black's opinion represents the views of six members of the Court, for Justice White wrote that he was 'glad to join my Brother Black's opinion.' . . . Because the two opinions are impossible to reconcile, however, we must narrow the holding to that subscribed to by both Justices White and Black." Id., 83 n.3.

The court concluded: "We hold only that the uncontested relationship [of father and son] here at issue is such that reasonable people would have to believe it provides strong evidence of partiality by the arbitrator." Id., 85; *Florasynth, Inc.* v. *Pickholz,* 750 F.2d 171 (2d Cir. 1984) adds nothing to the issue as it was decided on procedural grounds.

Finally, we do not agree with the plaintiff that the balance tips in favor of an "appearance of bias" test in Connecticut because the labor arbitrator has a statutory duty to "represent" the union. This mere fact alone in no way elevates the standard for disqualification. Any weight it may have is outweighed by the "hands off" policy our Supreme Court and this court have repeatedly stressed in arbitration matters.

We conclude, like the decision in *Morelite,* that evident partiality in 9 U.S.C. § 10 (b) is more than the mere "appearance of bias" and less than "proof of partiality." We conclude that "evident partiality" will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration. To put it in the vernacular, "evident partiality" exists where it reasonably looks as though a given arbitrator would tend to favor one of the parties. This is not the case here.

There is no error.

In this opinion the other judges concurred.